RECEIVED
JAN 29 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Law Offices of Jamel Oeser-Sweat
Jamel Oeser-Sweat (JOS–7936)
45 West 21st Street, 3rd Floor
New York New York 10010
Phone: (212) 675-7955
Attorney for Plaintiff, Joseph Corona

JUDGE SWAIN

07 CV 692

Docket No.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSEPH A. CORONA,

         Plaintiff,

        vs.

CITY OF NEW YORK, and FIRE DEPARTMENT
OF THE CITY OF NEW YORK

        Defendants.

**VERIFIED COMPLAINT**

<u>Jury Trial Demanded</u>

The plaintiff, by his attorneys, the Law Office of Jamel Oeser-Sweat, as and for his complaint against the Defendants, pursuant to Rule 8 of the Federal Rules of Civil Procedure, respectfully alleges:

## **JURISDICTION**

1.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C §§ 1331 and 1332;  28 U.S.C. § 1343(1), (2), (3) and (4); 28 U.S.C. §§2201 and 2202; Title I of the Americans with Disabilities Act of 1990, 42 U.S.C §§ 12101 *et seq.*; 42 U.S.C §§ 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9; and 42 U.S.C. §2000-e, *et seq.*; the Fifth, Thirteenth, Fourteenth and Fifteenth Amendments of the United States Constitution; New York Executive Law §296; and the New York State Constitution, Article 1, Sec. 3, as well as this Court's pendant and ancillary jurisdiction concerning state law claims.

Jurisdiction is further conferred to this Court due to the federal questions presented by virtue of the plaintiff's allegations that his civil rights under the United States Constitution has been violated.

2.      All conditions precedent to the filing of this action have been met by Plaintiff in that he has filed a timely complaint with the Equal Employment Opportunity Commission and has filed this action within 90 days of receiving a right-to sue letter from the Commission.

## VENUE

3.      This action is instituted in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §1391(b) and (c).

## NATURE OF CLAIMS

5.      This action to redress Defendant's discrimination against Plaintiff because of his disability is for injunctive relief, compensatory damages, punitive damages, attorney's fees, expert fees and other relief to remedy acts of employment discrimination, Negligence, wrongful and retaliatory termination of employment based upon the plaintiff's disability in regard to job application procedures, the hiring, advancement, and/or discharge of Plaintiff, Plaintiff's employee compensation, job training, and other terms, conditions, and privileges of employment, as well as for negligent hiring, negligent supervision and negligent interference with contractual relations, in violation of state and federal laws.  The Defendants failed to promote Plaintiff to the status of fire fighter and discharged him despite his having performed better than other similarly situated persons

who were not disabled who were allowed to be promoted to the status of fire fighter from being probationary fire fighters.

6.     The defendants have caused further and additional damage to the plaintiff pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*, as well as pursuant to 42 U.S.C. §2000-e, *et seq.,* in that the defendant have subjected and caused the plaintiff, a disabled person and citizen of the United States of America, to be subjected to and otherwise deprived of his rights, privileges or immunities secured by the Constitution and the laws of the United States of America and those of the State of New York.  On or about October 25, 2006, the United States Equal Employment Opportunity Commission ("EEOC") issued a notice a of right to sue under Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act ("ADA") based upon a charge investigated by Samanthia Canary.  The Plaintiff received the letter on or about October 31, 2006.  The EEOC Charge Number referenced in the NOTICE OF RIGHT TO SUE is 160200600197.

## **PARTIES**

7.     At all material times hereinafter set forth the Plaintiff, Joseph A. Corona (referred to herein as "Plaintiff"), is and was an individual with a disability (bone masses in knee and joints; Multiple Hereditary Exostosis) and a physical and/or mental impairment that substantially limits one or more of the major life activities of Plaintiff; was an individual who had a record of having such a disability; was an individual who is and was regarded as having such an impairment and a resident of the State of New York and at all times pertinent to this litigation was a resident of the State of New York, County of Queens.  From on or before March 8, 2005 until on or about June 17, 2005 the

Plaintiff was an employee of the Defendant, Fire Department of the City of New York, which is located at Metrotech Center, Brooklyn, New York 11201-3857.

8.     Upon information and belief, and at all material times hereinafter set forth, Defendant, City of New York (referred to herein as "CITY" and/or "Defendant City") is, based upon information and belief, a municipal entity and a Professional Corporation organized under the laws of the State of New York and runs the Fire Department of the City of New York.

9.     Upon information and belief, and at all material times hereinafter set forth, Defendant, Fire Department of the City of New York (referred to herein as "Fire Department" and/or "Defendant FDNY"), is an agency of Defendant City, run by the Defendant City of New York.  The Commissioner of Defendant FDNY is and was Nicholas Scoppetta.  Further, upon information and belief, Defendant Fire Department of the City of is also known as "FDNY" and the City of New York Fire Department.

## FACTS

10.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" though "9" above, as if fully set forth herein.

11.     On or about March 8, 2005, Plaintiff was appointed as a Probationary Firefighter.

12.     On or about April 19, 2004, prior to his appointment, Plaintiff filled out initial hiring documentation in which he was asked questions regarding his medical condition and in which he disclosed a genetic condition that he had known as Multiple

Hereditary Exostosis.  The Plaintiff's condition is a inherited genetic disorder.  He also disclosed the fact that he had previously had surgery to remove a bone mass.

13.     The Plaintiff entered Defendant FDNY's fire academy and made a great effort to perform to the standards required of him so that he could become a firefighter.

14.     On Thursday April 14, 2005, Plaintiff had trouble controlling a hoseline and there were extensive sessions in the academy that day dealing with hoselines.  There was also a class on Firefighting Victim Removal which involved a great deal of work crawling.

15.     Plaintiff also attended several extra sessions after classes were over on April 14, 2005.  Plaintiff was told that the hoseline was one of his weak areas and he wanted to improve in that area.  It was this desire that led him to attend the extra sessions each day.

16.     The sessions on April 14, 2005 were particularly more grueling and demanding than before, because Plaintiff had volunteered to handle the hoseline a number of times, since the attendance at the session by other probationary firefighters was low.  He saw this as an opportunity to gain more skill with the hoseline.

17.     After the sessions, the crawling and extra work caused some pain in the Plaintiff's knee when he arrived home.  The knee subsequently became swollen and the pain increased.  Plaintiff put ice on the knee frequently, but in the coming week, the knee only got worse.

18.     On April 22, 2005, Plaintiff was still feeling pain and went to the FDNY Medical Office at Metrotech Center to have his knee checked out.  Plaintiff did not want to miss any classes and tried to get his knee there to accomplish this.

19.     Plaintiff had a medical examination and then a doctor looked at his x-rays which were already on file with the FDNY that were taken during a pre-appointment medical review and stated that he had some concern for the bone condition that the Plaintiff has.

20.     Multiple Hereditary Exostosis presents as extra bone masses in some joints, and the fact that the Plaintiff had this condition was disclosed to the FDNY prior to the Plaintiff's appointment to the academy.

21.     Plaintiff had been examined and cleared for duty after said disclosure of his condition.

22.     The doctor on April 22, 2005 told the Plaintiff that he was authorized for a week of light duty to allow the knee to rehabilitate.

23.     Plaintiff also saw his own private doctor, Dr. Ruden on April 23, 2005 to ensure that he was properly taking care of his knee.  He was referred to an orthopedist, Dr. Capozzi for further examination.

24.     Upon being examined by Dr. Capozzi, the orthopedist, Plaintiff took an x-ray which showed nothing phenomenal but Dr. Capozzi still expressed concern and ordered a bone scan.

25.     On April 29, 2005, the Plaintiff saw the FDNY doctor again and was approved for full duty status despite having only spent four days on light duty.

26.     On May 2, 2005 the Plaintiff had his first day back in the academy.  He was called into Chief Santangelo's office along with several other probationary firefighters including Peter Augustovick, Rannie Battle, and Sarinya Srisakul.

27.     During the meeting with Chief Santangelo, Plaintiff was told by Chief Santangelo and Captain Ferro that he had a few deficiencies and that there was a possibility of his needing to repeat the academy.

28.     The other three probationary firefighters referenced above were told in sum and substance the same thing about having deficiencies.

29.     Plaintiff acknowledged having some problems and expressed an eagerness to continue his education after having come off a week of light duty and that he wanted to continue his extra classes as well.  He was told that he would be watched and that a decision would be made later regarding the possibility of his repeating the academy.

30.     On May 5, 2005, an instructor at the academy, Firefighter Moran, constructed a cardboard lime and instructed Plaintiff to place the lime on top of his helmet, and wear the lime throughout the day.

31.     The rationale offered for this hazing was that since the Plaintiff's last name is Corona, and May 5, 2005 is a Mexican holiday known as Cinco de Mayo, the instructors found his wearing of the lime very humerous.

32.     While Plaintiff did not feel that he was made to wear the lime because of his disability, given the circumstances and his standing and position to date, he felt he had no choice but to wear the lime and to deal with the circumstances and hazing as he was already being warned about his standing at the academy.

33.     The Plaintiff was humiliated and embarrassed by this incident.  A number of photos were taken of him on that day, with instructors and without.

34.     Visiting firefighters who were training at the academy pulled Plaintiff aside throughout the day and questioned him regarding what he had done to deserve having to wear the lime.

35.     Plaintiff was only ordered to remove the lime during the afternoon by Lt. Fiorino, when he informed Plaintiff that the Chief of the department, Chief Hayden was present on Academy grounds.

36.     On May 13, 2005, the aforementioned bone scan was performed on the Plaintiff.

37.     During the period of May 16, 2005-May 19, 2005, The orthopedist attempted to but could not contact the Plaintiff due to the Plaintiff's unavailability during the hours of the academy in part due to the academy's cell phone policies.

38.     Plaintiff eventually spoke to the Doctor, who informed Plaintiff that the scan showed a stress fracture in the left knee, and that was the cause of the pain that Plaintiff was experiencing.

39.     Plaintiff, after having worked so hard to graduate, decided that graduation was imminent and that he would not share the results of the scan with his instructors, as he was capable of accomplishing the day to day tasks of the academy.

40.     Plaintiff was also aware that if he had missed another day of classes, he would have to repeat the entire academy again.

41.     During the next two weeks, which were the last two weeks of the academy, the Plaintiff made every attempt that he could to show the instructors and Defendant FDNY that he was capable of handling the job of being a fire fighter.

42.     Plaintiff passed the final examination with a 90 percent.  His average was well above the academy's standards for passing.

43.     Plaintiff further worked to show that he was qualified to be a firefighter by doing well on the physical finals.  He finished the 1.5 mile run in 9 minutes and 45 seconds, despite having a fracture.  The passing time was 12 minutes.

44.     The academy standard for pull-ups was four (4) pull ups.  Plaintiff completed nine (9) pull-ups.  There are probationary firefighters who failed this category who are currently on the job as fire fighters.

45.     In the push-up section, which was a pass/fail event, Plaintiff passed.  In the sit-up category, the requirement was thirty (30) sit-ups in a minute.  Plaintiff almost doubled the standard by completing fifty one (51) sit-ups in a minute.

46.     Plaintiff pasted the CPAT exam, which is a state final exam for firefighters consisting of timely negotiating am obstacle course with minutes to spare.  Based upon information and belief the CPAT is now the physical entrance exam for the academy.   Upon information and belief, the commissioner believes that anyone who passes this exam should be physically capable of being a fire fighter.

47.     Of the four probationary firefighters who met with Chief Santangelo, Plaintiff had performed the best in each and every one of the above referenced categories and many times out performed those who were not in danger of repeating the academy.

48.     Despite the above referenced accomplishments, Plaintiff was on May 25, 2005 summoned again to Chief Santangelo's office.  Captain Ferro was present and Plaintiff was informed that he was unfortunately going to be recycled into the next session of the Fire Academy.

49.     Plaintiff was told to sign a review given of his performance that listed about 4 or 5 deficiencies.  He was asked if he disagreed with any of the remarks.  He state that he did disagree but that the instructor's opinion outranked his own.

50.     Plaintiff was told to sign the evaluation which contained a suggestion that he recycle back into the academy.

51.     Plaintiff was told that he was not the only one and that four or five others would be recycled.  Plaintiff later learned that this was a lie.

52.     On May 26, 2005, Plaintiff learned that only he and Sarinya Srisakul were being recycled.

53.     Plaintiff on May 26, 2005 made his instructors aware of his stress fracture, hoping that he could sit out the May class and be fully prepared to join in September, the next scheduled class.

54.     Plaintiff first spoke to Drill Instructor Backett about this matter, who referred Plaintiff to Captain Ferro.  Captain Ferro eventually sent Plaintiff to the FDNY Medical Office and Chief Moriarty.

55.     On June 3, 2005, Plaintiff was sent to Metro tech to see the FDNY doctor. The doctor ordered x-rays and again concentrated on the bone condition.

56.     Plaintiff's bone condition, which is genetic, consists of extra bone masses in various parts of his body, which were present and not an issue to FDNY doctors at any time before.  FDNY doctors cleared Plaintiff for active duty and to go through the academy despite their full knowledge of the condition/disability.

57.     The FDNY doctors were not aware of the bone scan that had been performed or that this was a stress fracture.  The doctor put Plaintiff on light duty for a month.

58.     During the medical visit, Plaintiff was told that he had to see Chief Moriarty before he left.

59.     Plaintiff went to see Chief Moriarty who told the Plaintiff that he had the opportunity to resign.  He was told to think about this opportunity over the weekend and that he should consider his bone condition and his performance in the academy thus far. He was also told to continue reporting to Metrotech. Plaintiff made Captain Ferro aware of the doctor's decision.

60.     On June 6, 2005, the Plaintiff reported to Metrotech, as instructed and was asked by Chief Moriarty whether he had made a decision.  The Plaintiff informed Chief Moriarty that he refused to resign.

61.     Upon learning of the Plaintiff's refusal, Chief Moriarty became agitated and informed the Plaintiff, in sum and substance, that he would have him medical boarded and kicked off the job.

62.     Plaintiff made the Chief aware that he had passed all of the physical requirements of the academy and that he was physically capable of handling the job.

63.     Chief Moriarty responded by stating in sum and substance Plaintiff's performance in the academy and the evolutions that he performed were unsatisfactory. Plaintiff refuted these statements, stating that he disagreed with some of the marks given to him and that he accepted the outcome of getting recycled and that he looked forward to

the opportunity to prove to the Chief and all of the instructors that he was and is capable of being a firefighter.

64.     Chief Moriarty then informed the Plaintiff that a Medical Board was to take place that Thursday, June 9, 2005 and that he was to report to Metrotech until he was told what the board's decision was.

65.     Chief Moriarty further informed Plaintiff that Plaintiff was to have no say or input in these matters.

66.     Plaintiff contacted his doctor to obtain a copy of the results of the bone scan, and provided them to the medical office.  He met with Dr. Kelly on or about June 7 or June 8 and was told for a second time that she does not see Plaintiff as having twenty (20) years on the job.  She also mentioned that since there was no direct trauma on Plaintiff's leg, she considered his bone condition as making him susceptible to stress fractures.

67.     Plaintiff informed Dr. Kelly, in sum and substance, that he was disheartened that no matter what he did, the FDNY doctors seem to think that he is not capable of having a long and distinguished career as a fire fighter despite the fact that they cleared him to be in the academy and that he had proven that he could handle the physical rigors of the academy.  Plaintiff disagreed with her stated opinion that he was unfit for the job and thanked her for her time before leaving.

68.     Several days passed without Plaintiff hearing from the FDNY, its employees and/or agents and on June 15, 2005, Plaintiff received a call from his parents telling him that the FDNY doctors were expecting him on the second floor, and that he

had not arrived.  He was not aware of the appointment but went downstairs.  He was almost immediately put in front of a full medical board.

69.     The doctors asked Plaintiff at this examination if he had any pain.  He said no and made them aware of what his doctor had told him, which was that the fracture was healing well but that he should not being running on it just yet, and suggested that he slowly build up by running longer distances every week.

70.     They doctors asked him to do a squat and then told him to wait outside.  A minute or two later, Dr. Kelly went outside and informed Plaintiff that he was to be put on full duty as of the following day.

71.     Plaintiff expressed some reservations about this considering his doctors advice and was informed by Dr. Kelly that she could not tell him what going on "full duty" actually meant.

72.     Plaintiff was told to report to Randall's Island the following morning.  On June 16, 2005, Plaintiff arrived and Captain Ferro was away at Metrotech for meetings. Lt. Woods considered putting Plaintiff right back in o the class that was in training but when Plaintiff informed him of what his doctor said, he opted to wait for Captain Ferro's return.

73.     Upon Captain Ferro's return, Plaintiff was told to report back to Metrotech to Chief Goldbach. Plaintiff did so and was brought into an office with Chief Goldbach and Chief Moriarty and told that since he did not resign, they would take the steps necessary to get him fired.

74.     Upon the Plaintiff asking why he would be fired considering the medical board had approved his return to duty, he was informed that the Medical Board did not

matter.  He was told that he was getting fired because of his allegedly poor performance in the academy.  He was once again told to report to Metrotech the next morning.

75.     Plaintiff contacted members of the UFA that night for help and was told that they would look into the matter and get back to him.  He knew it was late in the matter to get union help, but he thought he had done nothing wrong or worthy of termination.  He also knew of a probationary firefighter who was going through a different situation had contacted the UFA and that Chief Moriarty had yelled at him for doing so.

76.     Plaintiff was told by Mr. Layne, of the UFA not to resign and that if they brought him into the office to discuss resignation or termination, tell them that he wanted his union representative to be present during any such talks.

77.     On June 17, 2005, Plaintiff arrived at Metro tech and while waiting, he was greeted by Lt. Ramos, the president of the Hispanic Society, who informed Plaintiff that he had heard about his case.  He proceeded to tell Plaintiff that if he resigned, that he would be given the opportunity to come back in September but that if he got fired, he would never have a shot.

78.     Plaintiff told Lt. Ramos that being a firefighter was the only city job that he wanted and that he did not want to voluntarily give it up.  As far was Plaintiff was aware, resigning and coming back was reserved for candidates who resigned early in the academy.  Plaintiff had already completed the academy.  Plaintiff felt like resigning was a signal that he did not want the job but such was not the case.  He also mentioned to Lr. Ramos that Moriarty and Goldbach made no mention of Plaintiff being able to come back and that resignation was the only option being presented to him.

79.     Chef Goldbach saw Plaintiff around noon and gave him one last opportunity to resign, showing Plaintiff a letter that he had written to Commissioner Scoppetta that as of the date Friday, June 17, 2005, he was officially terminated.

80.     As Plaintiff as informed to do by Mr. Layne, he told Chief Goldbach that he didn't want to discuss termination or resignation without his union representative present.  He was told to wait outside.

81.     He was then brought back into the office with Chief Moriarty and Chief Goldbach present and told that as of that moment since he had not resigned, that Plaintiff was terminated.  They took the Plaintiff's Identification Card from him.

82.     On Monday, June 20, 2005 the Plaintiff received a note from Dr. Capozzi, his private doctor, stating that he felt he Plaintiff should not be running on the knee for at least a few more weeks.  Plaintiff then returned to the medical division at Metrotech to contest being put back on full duty.

83.     The doctor at Metrotech took the note and left the room.  When he returned he informed the Plaintiff that although he had obtained the note from his doctor, it was the FDNY doctors that made the decisions there and that they had made the decision that he was fit for duty.

84.     Plaintiff was not allowed to leave the premises without reporting to personnel.  He met with BC Houton, who was confused by his presence and felt that he was causing trouble.

85.     BC Houton informed the Plaintiff that he was to return his firefighter gear and to bring the receipt back with his badges.  He told him that he had his badges there but BC Houton told him to return the gear first.  BC Houton then received a call on his

cell phone from Chief Moriarty regarding another issue.  He stepped outside and as he left, he mentioned Plaintiff's presence to Chief Moriarty.  A few minutes later he came back and refuted his earlier statements, demanding that Plaintiff give him the badges at that moment.  He was reluctant to do so but felt it would be disobeying orders if he refused.

86.   In a letter dated June 17, 2005 which was signed by Fire Commissioner Nicholas Scoppetta, Plaintiff was terminated from his position of probationary fighter for allegedly failing to meet the minimum job requirements for appointment.

87.   Plaintiff was terminated for allegedly failing to meet the minimum job requirements for appointment despite having done better in the academy and having better class standing than other applicants who were not disabled who were allowed to graduate and be appointed as firefighters.

88.   Fire Commissioner Nicholas Scoppetta, Chief Moriarty, and Chief Goldbach are high ranking decision making agents, employees, and/or officers of the Defendant FDNY and the Defendant City of New York.

## FOR A FIRST CAUSE OF ACTION

### (Emotional Distress)

89.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" though "88" above, as if fully set forth herein.

90.   As a result of the Defendants' and their agents' officers' and employees' insensitivity to Plaintiff's disability and their discrimination against him, he has suffered and endured humiliation, damage to his reputation, mental and emotional distress, and/or pain and suffering.

91.     As a result of the actions of the Defendants, Plaintiff has suffered, is suffering and will continue to suffer irreparable harm, damage, discrimination, loss of self-esteem loss of employment and loss of income and security.  Plaintiff also lost heath insurance and was forced to pay for physical therapy out of pocket.

## FOR A SECOND CAUSE OF ACTION

### (Violation of the ADA)

92.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" though "91" above, as if fully set forth herein.

93.     The Defendants' refusal to provide or allow reasonable accommodations to Plaintiff's disability so that he could continue to finish the Fire Academy as a probationary firefighter and the essential functions thereof and it placing him on full duty and not allowing him to finish the academy the second time as well as its actions during the Plaintiff's first cycle in the Fire Academy, coupled with their discharge of him because of his disability, constitutes discrimination in violation of the ADA.

94.     Plaintiff has further been discriminated against a despite being a qualified individual with a disability because of his disability in matters of  job application procedures, hiring, advancement, and/or discharge, employee compensation, job training, and other terms, conditions, and privileges of employment.

95.     Defendants have engaged in the limiting, segregating, or classifying of Plaintiff in a way that adversely affects the opportunities or status of Plaintiff because of his disability.

96.     Defendants have participated in a contractual or other arrangement or relationship that has the effect of subjecting a Plaintiff, a person with a disability, to the discrimination prohibited by the ADA.

97.     Defendants have utilized standards, criteria, and/or methods of administration that that have the effect of discrimination on the basis of disability and/or that perpetuate the discrimination of others who are subject to common administrative control.

98.     Defendants have excluding or otherwise denying equal jobs or benefits to Plaintiff, a qualified individual because of the known disability of Plaintiff.

99.     Defendants have discriminated against the Plaintiff by not making reasonable accommodations to the known physical or mental limitations of Plaintiff, an otherwise qualified individual with a disability of Plaintiff, who was/is an applicant or employee, and Defendants can not demonstrate that the accommodation would/would have impose(d) an undue hardship on the operation of the business of the Defendants.

100.    Defendants have discriminated against the Plaintiff by denying employment opportunities to Plaintiff, a job applicant or employee who was/is an otherwise qualified individual with a disability, and such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the Plaintiff.

101.    Defendants have discriminated against the Plaintiff by using qualification standards, employment tests or other selection criteria that screen out or tend to screen out Plaintiff, and/or an individual with a disability or a class of individuals with disabilities and the standard, test or other selection criteria, as used by the covered entity,

is not, has not and can not be shown to be job-related for the position of Plaintiff and is/was inconsistent with business necessity;

102.      Defendants have discriminated against the Plaintiff by failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant.

103.      As a result of the actions of the defendants, Plaintiff has suffered, is suffering and will continue to suffer irreparable harm, damage, discrimination, loss of self-esteem loss of employment and loss of income and security.

104.      Defendants are entities covered under the Americans with Disabilities Act.

105.      Accordingly, the defendants have violated Plaintiff's rights under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111 *et seq.*, as well as pursuant to 42 U.S.C. §2000-e, *et seq.* and under the Constitution of the State of New York and Constitution of the United States of America.

## FOR A THIRD CAUSE OF ACTION

### (Violation of the ADA-Punitive Damages)

106.      Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" though "105" above, as if fully set forth herein.

107.      The Defendants' refusal to allow the Plaintiff to utilize accommodations to combat his genetic disability that he would have provided at his own expense as well as

its refusal to explore reasonable accommodations for his disability, its placing him on involuntary leave from the class in the Academy, its requirement that he could only return to the academy on full duty, and its discrimination against Plaintiff based on his disability despite having full knowledge of it when he was hired, as well as Plaintiff's discharge constitutes gross, wanton, reckless, and/or intentional violations of his rights under the ADA, entitling him to damages and punitive damages.

### FOR A FOURTH CAUSE OF ACTION

### (Negligent Supervision)

108.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" though "107" above, as if fully set forth herein.

109.    Defendants City and FDNY and their officers were negligent in their supervision of the Defendant FDNY's employees officers and agents.

110.    Defendants had actual and constructive notice of the hazing and discrimination taking place with respect to the Plaintiff.

111.    Defendants knew and/or should have known about the fact that Plaintiff was being harassed, put under duress to resign, held to a different standard than others, forced to wear a lime in the presence of others for no professional reason and ultimately illegally terminated.

112.    Accordingly, Defendants City and FDNY and their officers were negligent in their supervision of the Defendant FDNY's employees officers and agents.

### FOR A FIFTH CAUSE OF ACTION

### (Hostile Environment/ Preferential Treatment)

113.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" though "112" above, as if fully set forth herein.

114.     Defendants had further actual and constructive notice of the fact that persons who were not disabled were given preferential treatment over those who were disabled.

115.     In response to the mounting hostility and continuing embarrassment Plaintiff began to suffer severe depression, and feelings of paranoia, and worthlessness.

116.     The Plaintiff's desperate pleas to supervisors only enforced the undercurrent of tension and stereotypes and fostered an environment hostile to persons with a disability.

117.     The doctors continually searched for a reason to terminate Defendant based on his disability at the direction of officers of the FDNY.

118.     Even despite learning that Plaintiff's disability had nothing to do with his physical problems, the doctors arbitrarily and capriciously fabricated a connection that had no basis in fact or science.

119.     Accordingly, Defendant City and Defendant FDNY were negligent in their supervision of employees, created a hostile work environment and permitted and allowed a work environment hostile to disabled persons and in particular, Plaintiff, to exist. These actions were violative of state and federal law and the constitutions of the United States of America and the State of New York.

## FOR A SIXTH CAUSE OF ACTION

(Intentional and Negligent Infliction of Emotional Distress)

120.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" though "119" above, as if fully set forth herein.

121.    Defendants, City and Defendant FDNY negligently and or intentionally inflicted emotional and psychological distress upon Plaintiff by repeatedly ignoring the use of his disability in evaluating him and remarks, and stereotypes which caused Plaintiff emotional and physiological harm, humiliation, embarrassment, loss of self-esteem, emotional and psychological distress and duress.

122.    Defendants negligently and or intentionally inflicted emotional and psychological distress upon Plaintiff in that they knowingly allowed and permitted a work environment hostile to persons with a disability to exist, and by not enforcing the policies and/or laws against discrimination and/or hazing and misconduct.

## FOR A SEVENTH CAUSE OF ACTION

### (*Respondent Superior*)

123.    Plaintiff, repeats, reiterates and realleges each and every allegation contained in paragraphs "1" though "123", above, as if fully set forth herein.

124.    Defendants City and FDNY though their actions and inactions and through the actions and inactions of Defendant FDNY clothed employees, agents and officers of Defendant FDNY with actual, constructive and apparent authority to engage in the acts alleged herein.

125.    Defendants City and FDNY also engaged in activities and acts as described herein which violated the Plaintiff's rights under State and Federal laws and

under the Constitution of the United States and the Constitution of the State of New York.

126.    Defendant City and Defendant FDNY had an official municipal policy that was the "direct cause" and/or "moving force" behind the constitutional violations described herein.

127.    Defendants City and FDNY are also liable under the doctrine of *respondent superior* as persons mentioned herein were agents, officers and or employees of the Defendants and said agents, officers and or employees were of the type required for liability under the Monell v. New York City Dep't of Social Services, 436 U.S. 658 (1978).

### FOR A EIGHTH CAUSE OF ACTION

#### (*Attorneys Fees*)

128.    Plaintiff, repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "127" above, as if fully set forth herein.

129.    Plaintiff respectfully requests that he be awarded attorneys' fees against the defendants, pursuant to the Americans with Disabilities Act, if he is the prevailing party in this matter.

### FOR A NINTH CAUSE OF ACTION

#### (*Expert's Fees*)

130.    Plaintiff, repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "129" above, as if fully set forth herein.

131.    Plaintiff respectfully requests that he be awarded expert fees against the

defendants, pursuant to the Americans with Disabilities Act, if he is the prevailing party

in this matter.

## DEMAND FOR JURY TRIAL

132.    Plaintiff, repeats, reiterates and realleges each and every allegation

contained in paragraphs "1" through "131" above, as if fully set forth herein.

133.    The plaintiff hereby demands a trial of his claims in this action by jury,

pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure.

WHEREFORE, Plaintiff respectfully requests that this Court:
1) Accept jurisdiction of this case.
2) Grant Plaintiff a trial by jury on all issues so triable.
3) Declare that Plaintiff has suffered acts of discrimination at the hands of Defendant based upon his disability.
4) Grant Plaintiff preliminary and permanent injunctive relief directing Defendant to provide Plaintiff with reasonable accommodations necessary for his to fulfill the essential functions of his job as a fire fighter.
5) Grant Plaintiff preliminary and permanent injunctive relief reinstating him to his former position as a Probationary Fire Fighter, with full privileges and benefits as if he has never been discharged or in the alternative, naming him as a fire fighter based on his completion of the Fire Department of the City of New York Academy.
6) Award Plaintiff compensation for his loss of salary and other benefits, including all fringe benefits to which he would have been entitled had his employment with Defendants not had been interrupted.  Such damages shall be in an amount in excess of $30,000, the exact amount to be determined at trial.
7) Award Plaintiff compensatory damages for the humiliation, damage to his reputation, mental and emotional distress, and pain and suffering that he has experience and endured as a result of the discriminatory actions of Defendants towards him.  Such damages shall be in an amount in excess of $3,000,000.00 for each of the nine causes of action herein.
8) Grant Plaintiff punitive damages against Defendants.  Such damages shall be in an amount in excess of $6,000,000.00, the exact amount to be determined at trial.
9) Grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law.
10) Grant Plaintiff his reasonable costs and attorney's fees

11)     Grant such other and further relief as to the Court seems just and proper.

Dated:      New York, New York
                January 24, 2007

LAW OFFICES OF JAMEL OESER-SWEAT

By:    Jamel Oeser-Sweat, Esq. (JO7936)
       Attorneys for Plaintiff
       45 West 21st Street, 3rd Floor
       New York, N.Y. 10010
       Phone: (212) 675-7955

To:

    City of New York
    Corporation Counsel
    100 Church Street
    New York, NY 10007
    (212) 788-0303

    Fire Department of the City of New York
    Corporation Counsel
    100 Church Street
    New York, NY 10007
    (212) 788-0303

## VERIFICATION

STATE OF NEW YORK    )
                        )   ss.:
COUNTY OF NEW YORK  )

      Plaintiff JOSEPH A. CORONA, being duly sworn, deposes and says:

I am the plaintiff in this action; I have read the foregoing verified complaint and know the

contents thereof and the same is true to my own knowledge except as those matters

alleged to be upon information and belief, and that as to those matters, I believe them to

be true.

_____
                JOSEPH A. CORONA

Sworn to before me this 29 day of
_____, 2007
  JAN

_____
      Notary Public

**KHALID MEHMUD**
**Notary Public, State of New York**
**No. 01ME6075109**
**Qualified in Queens County**
**Commission Expires 06/03/20__**